UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JOHN MILITO, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MATTRESS FIRM, INC.,<br><br>Defendant. | CASE NO. 2:26-cv-00227-TL<br><br>ORDER REMANDING CASE |

This matter is before the Court *sua sponte*. Having reviewed the record, and finding oral argument unnecessary, *see* LCR 7(b)(4), the Court finds that it lacks subject-matter jurisdiction over this action. Therefore, pursuant to 28 U.S.C. § 1447(c), the Court REMANDS the case to King County Superior Court. *See D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1035 (9th Cir. 2008) ("Federal courts are *required* sua sponte to examine jurisdictional issues such as standing." (quoting *Bernhardt v. County of Los Angeles*, 279 F.3d 862, 868 (9th Cir. 2001))).

# I. Background

## A. Commercial Electronic Mail Act and Consumer Protection Act

Washington's Commercial Electronic Mail Act ("CEMA"), Chapter 19.190 RCW, "prohibits sending Washington residents commercial e-mails that contain any false or misleading information in the subject lines of such e-mails." *Brown v. Old Navy, LLC*, 4 Wn.3d 580, 596, 567 P.3d 38 (2025) (emphasis removed). "A violation of CEMA's e-mail regulations is a per se violation of the Consumer Protection Act (CPA)." *Id.* at 584. In this case, Plaintiff alleges that he was the recipient of emails from Defendant Mattress Firm, Inc., that, among other things, included subject lines that were "false, misleading, and unlawful because they promote[d] misleading discounts, under false time restrictions, and/or from misleading regular and former prices." Dkt. No. 1-3 (state-court complaint) ¶ 3. These emails "created the false impression that the Products' regular and former prices as charged on the website [were] higher than they truly [were], the discounts [were] limited in time, and the discounts [were] genuine." *Id.* ¶ 19.

## B. Procedural Background

On December 19, 2025, Plaintiff filed this purported class action in King County Superior Court, alleging violations of CEMA and the CPA. *See generally* Dkt. No. 1-3. On January 21, 2026, Defendant removed the action to federal court, alleging this Court's subject-matter jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). *See* Dkt. No. 1 (notice of removal) ¶ 8.

On March 30, 2026, Defendant moved to dismiss the case. Dkt. No. 20.

On July 8, 2026, the Court ordered Defendant to show cause as to why this case should not be remanded to Superior Court. Dkt. No. 24. On July 22, 2026, Defendant responded to the show-cause order (Dkt. No. 26), and Plaintiff responded on July 29, 2026 (Dkt. No. 28).

## II. Legal Standard

### A. Mandatory Remand

28 U.S.C. § 1447(c) provides, in part, that "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." *See Sauk-Suiattle Indian Tribe v. City of Seattle*, 56 F.4th 1179, 1189 (9th Cir. 2022). The statute is imperative: "Section 1447(c) is mandatory, not discretionary." *Bruns v. Nat'l Credit Union Admin.*, 122 F.3d 1251, 1257 (9th Cir. 1997).

### B. Standing

Federal courts are constrained by the case-and-controversy requirement of Article III, which limits the jurisdiction of federal courts to cases where plaintiffs have established standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "Standing" exists where a plaintiff is entitled to bring their claims before the court and is an essential ingredient of determining a court's jurisdiction. *See Perry v. Newsom*, 18 F.4th 622, 630–31 (9th Cir. 2021). In order to have standing to bring a lawsuit, a plaintiff must demonstrate an injury that is (1) "concrete, particularized, and actual or imminent" (an "injury-in-fact"), (2) "fairly traceable to the challenged action," and (3) "redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561.

## III. Discussion

### A. Injury-in-fact

"Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins (Spokeo II)*, 578 U.S. 330, 341 (2016). This means that "a plaintiff does not 'automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'"

*Robins v. Spokeo, Inc. (Spokeo III)*, 867 F.3d 1108, 1112 (9th Cir. 2017) (quoting *Spokeo II*, 578 U.S. at 341); *see Stutsman v. Sirius XM Radio LLC*, No. C25-1113, 2026 WL 2445129, at *2 (W.D. Wash. Aug. 20, 2026) ("[T]he legislature's creation of a statutory prohibition or obligation and a cause of action 'does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III[.]'" (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021))).

Here, Plaintiff alleges three types of misconduct. First, Defendant sent emails containing deceptive subject lines. One version of the deception "created the false impression that the Products' regular and former prices as charged on the website are higher than they truly are[.]" Dkt. No. 1-3 ¶ 19. In a second version,

> Defendant . . . sent emails with subject lines stating that purported sales were set to expire soon, or on a specific date, or when a holiday ends. But when many sales ended, they were either extended or another comparable sale began, and the Products' prices did not immediately revert to the supposed pre-sale Reference Prices for a reasonably substantial time period.

*Id.* ¶ 23. Second, Defendant's emails "clog up inboxes with spam email, waste data space[.]" *Id.* ¶ 44. Finally, Defendant's emails "violate Plaintiff['s] . . . statutory right to be free from deceptive commercial emails." *Id.*

But misconduct is one thing; injury caused by that misconduct is quite another. Here, the pleading appears to allege two harms—(1) a violation of Plaintiff's "statutory right not to receive commercial emails that contain false or misleading subject lines"; and (2) Plaintiff's actual receipt of the emails which, as mentioned above, has led to clogged inboxes and wasted data space. *Id.* (citing RCW 19.190.030(3)). Neither is sufficient to establish Article III standing.

As to the statutory violation, in *Stutsman*, the court remanded a similar case to state court, "follow[ing] an ever-growing list of decisions finding that the mere receipt of alleged misleading

or false marketing email subject lines, absent any allegation of economic loss, detrimental reliance, or any comparable injury, does not constitute a concrete harm sufficient to establish Article III injury." *Stutsman*, 2026 WL 2445129, at *4 (collecting cases). Similarly here, the pleading lacks any allegations of economic loss or detrimental reliance. Nor does it include any indication, beyond the reference to clogged inboxes, that the allegedly offending emails were particularly unwelcome. In fact, Plaintiff affirmatively acknowledges that he "would have liked to receive truthful information from Defendant regarding its Products." Dkt. No. 1-3 ¶ 59. This is not merely an indication of *consent* to the receipt of Defendant's emails. It also indicates that the "clog" itself was not something that Plaintiff was particularly concerned about. In *Huong v. Beis LLC*, another CEMA case in this District, the plaintiff's pleading described plaintiff's "momentary panic upon reading the subject line of an email," because plaintiff thought "her identity had been stolen[.]" No. C26-2207, 2026 WL 2620511, at *2–3 (W.D. Wash. Sept. 4, 2026). This, at the very least, demonstrated some unpleasantness, however fleeting, associated with receipt of the emails at issue.[1] Here, however, nothing of the sort has been alleged. As pleaded, then, the statutory violation is not sufficient to demonstrate Article III injury.

As to the clogged inboxes, Defendant invokes an analysis from the Washington Supreme Court, which opined in 2001 that "the harm from misleading commercial email resembles the harm from 'sending junk mail with postage due or making telemarketing calls to someone's pay-per-minute cellular phone[.]'" Dkt. No. 26 at 9 (quoting *State v. Heckel*, 143 Wn.2d 824, 835, 24 P.3d 404 (2001)). Yet both of these examples exact a direct financial toll on the recipient and, indeed, in *Heckel*, the Washington Supreme Court cited them as illustrative of "*cost*-shifting . . . from deceptive spammers to businesses and email users[.]" *Heckel*, 143 Wn.2d at 835 (emphasis

[1] Even so, the court concluded that Huong's panicked reaction was "insufficient to constitute an injury in fact that satisfies Article III." *Huong*, 2026 WL 2620511, at *3.

added). And where that court concluded that "the use of false or misleading subject lines . . . hampers an individual's ability to use computer time most efficiently," this was with regard to "spam" messages that were "'virtually impossible' to distinguish . . . from legitimate personal or business messages." *Id.*

Here, Plaintiff's complaint is not that he cannot determine from the subject line whether the message is a "legitimate personal or business message." There is no indication that he spent any time or dedicated resources to puzzling over how to do so. In any event, it is not reasonable that anyone receiving an email from *Mattress Firm* bearing the subject line "You're in luck: up to 72% off mattresses is here" (Dkt. No. 1-3 ¶ 25) would confuse this with personal correspondence from friends or family.[2] Indeed, Plaintiff's concern concerns marketing—that "[r]easonable recipients of [Defendant's] emails would believe that Defendant was offering a limited time sale." *Id.* ¶ 26. Finally, where "clog" might aptly describe an unwanted situation where a physical postbox is inconveniently overstuffed with paper- and cardboard-enclosed mailpieces, it fails to capture the reality of an email inbox, which cannot "overflow" or "clog." Regardless, this is not the harm that Defendant invokes when it refers to and relies upon *Heckel* to suggest the existence of pecuniary injury—a form of injury which, as discussed above, is not in evidence here.[3]

And while Plaintiff refers to "waste[d] data space" (Dkt. No. 1-3 ¶ 44), there is no indication that this had any real effect on Plaintiff's use and enjoyment of his email—for example, an imperative to purchase more storage space, an afternoon dedicated to the taxing

---

[2] In *Heckel*, the court used "Hi There!," "Information Request," and "Your Business Records" as examples of subject lines that would frustrate and confuse recipients. *Heckel*, 143 Wn.2d at 835.

[3] It is also worth noting that *Heckel* was decided 25 years ago, when users' relationship with email and data was generationally different than it is today.

chore of sorting and deleting the purportedly unwanted messages, or an inability to locate more imminently desired communications.

For another, Defendant re-frames the offending behavior as "resembl[ing] 'nuisance or fraud actions that 'have long been heard by American courts.'" Dkt. No. 26 at 9 (quoting *Harbers v. Eddie Bauer, LLC*, 415 F. Supp. 3d 999, 1008 (W.D. Wash. 2019)). There are two problems with this argument.

First, notwithstanding the negative connotations of the word "clog," as suggested above, Plaintiff does not actually allege how the flow of Defendant's emails into his inbox was a nuisance. The only Party here who definitively describes the emails as "unwanted" is Defendant. This misreads the complaint, which is directed toward allegedly *deceptive* emails and suggests that the "nuisance" would actually be welcome (and therefore not a nuisance at all) if the subject lines that constituted its vanguard were truthful. *See* Dkt. No. 1-3 ¶ 59 ("Plaintiff would have liked to receive truthful information from Defendant regarding its Products."). Moreover, in Washington, "generally, an activity is a nuisance only when it 'interferes unreasonably with other persons' use and enjoyment of their property.'" *Moore v. Steve's Outboard Serv.*, 182 Wn.2d 151, 155, 339 P.3d 169 (2014) (quoting *Tieg v. Watts*, 135 Wn.2d 1, 13, 954 P.2d 877 (1998)). Such "interference" is a specific and particular thing to suffer (and allege).

Defendant, citing a Fourth Circuit case, argues that considering whether Plaintiff consented to the allegedly offending conduct is an inquiry into the merits of the claim and, as such, is not properly part of a jurisdictional analysis. *See* Dkt. No. 26 at 11–13 (discussing *Beyond Sys., Inc. v. Kraft Foods, Inc.*, 777 F.3d 712, 715–16 (4th Cir. 2015)). Defendant argues that it is inappropriate at this procedural posture to apply the common-law doctrine of *volenti non fit injuria*, "which provides that a party who invites the harm they allege to have suffered cannot then recover in tort for that harm." *Id.* at 11; *see* Restatement (Second) of Torts § 892A

(A.L.I. 1979) ("Effect of Consent"). "Because *volenti non fit injuria* goes to the merits of the claim—and not to Article III standing," Defendant argues, "federal courts have consistently applied it to tort claims for well over a century." Dkt. No. 26 at 11 (collecting cases).

But the issue is not whether Plaintiff consented to suffer, but rather whether he even suffered in the first place. For this reason, Defendant's *volenti non fit injuria* argument is not entirely applicable to the purported nuisance that Defendant claims to have located in this case. Here, the offending conduct shares an identity with the purported harm. To illustrate, a comparison is in order. Consider a tort like battery, which can be conceptually divided into the conduct—say, the throwing of a punch—and the harm—say, a broken nose. The broken nose is, on its face, an injury—a broken bone, a disfigured countenance, pain, etc. It is separate from the tortfeasor's punch, to which the victim—a boxer, for example—might have consented. The prizefighter may want to compete in their combat sport and, accordingly, drop their legal objection to the *conduct* of being punched in the face. But win or lose, they still hope to escape the ring without the *injury* of a broken nose. The Court would necessarily need to examine the specific circumstances of such a situation—i.e., the merits—to determine consent and liability. In contrast, where something like a virtual email inbox is concerned, and where Plaintiff does not clearly allege any injury that *resulted from* Defendant's conduct, there is no injury to account for beyond the allege misconduct itself. Here, both the tortfeasor's perpetration *of* the nuisance—in this case, sending emails—and the victim's purported suffering *from* the nuisance—in this case, receiving them—are two sides of the same coin. Conduct and injury are amalgamated together into what Defendant, by labeling its conduct as nuisance, now asserts was an unreasonable interference with the victim's "use and enjoyment of" their email service. *See Moore*, 182 Wn.2d at 155. But that has not actually been alleged. Despite Defendant's conduct, Plaintiff's use and enjoyment of email—the chief injury of a nuisance claim—remained unaffected.

Here, the fairest reading of the complaint clearly indicates that Plaintiff's gripe is with the *content* of Defendant's emails, not his receipt of them or their presence in his inbox. Tellingly, he makes no allegation that he did not consent to the transmission of the emails (Indeed, he provided Defendant with his email address (Dkt. No. 1-3 ¶ 55)), and he does not allege any specific interference with his use and enjoyment of his email service. As the "plaintiff is the master of [their] complaint and responsible for articulating cognizable claims," it is not—at this procedural posture—within Defendant's purview to explain to Plaintiff what harm *really* befell him. *Newtok Village v. Patrick*, 21 F.4th 608, 616 (9th Cir. 2021).

Second, as to fraud, Plaintiff simply fails to allege that he was defrauded. The Court is hard-pressed to construe the complaint as a pleading that alleges fraud as a cause of action. "Washington has adopted the nine common law elements of fraud, and, at its core, a fraud claim requires a false representation of material fact." *Puget Soundkeeper All. v. APM Terminals Tacoma LLC*, 574 F. Supp. 3d 903, 909 (W.D. Wash. 2021). The giveaway here is in the word "material." Because Plaintiff never alleges what actions he did or did not take in reliance on (or response to) the offending subject lines, there is simply nothing "material" about them. Plaintiff does not allege that he overpaid for anything, that he prematurely purchased something, or that he reacted to them in any notable way whatsoever. As alleged, the only manifest intersection between the alleged mistruth(s) and Plaintiff's life is the filing of this litigation. The Court will not locate an injury predicated upon fraud where Plaintiff has not given any indication that he was, in fact, defrauded.

In sum, Plaintiffs have not established an injury-in-fact that is sufficiently concrete to confer Article III standing.

**B. Costs**

Plaintiff advises that, should the Court remand this case, "in the spirit of cooperation and courtesy, Plaintiff's counsel is not seeking an award of fees and costs for wrongful removal under 28 U.S.C. § 1447(c)" The Court appreciates the conciliatory approach and will not assess any costs or fees.

## IV. CONCLUSION

Accordingly, it is hereby ORDERED that this case be REMANDED to King County Superior Court.

Dated this 10th day of November 2026.

Tana Lin
United States District Judge